# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **REDDING RANCHERIA,** ) | |
| **a federally-recognized Indian tribe,** ) | |
| **2000 Redding Rancheria Road,** ) | |
| **Redding, CA  96001,** ) | |
| ) | **Case No. _____** |
| **Plaintiff**, ) | |
| ) | |
| **v.** ) | |
| ) | |
| **SYLVIA MATTHEWS BURWELL, Secretary,** ) | |
| **United States Department of Health and** ) | |
| **Human Service,** ) | |
| **U.S. Department of Health & Human Services** ) | |
| **200 Independence Avenue, S.W.** ) | |
| **Washington, D.C.  20201** ) | |
| ) | |
| **And** ) | |
| ) | |
| **YVETTE ROUBIDEAUX,** ) | |
| **Acting Director, United States Indian Health** ) | |
| **Service,** ) | |
| **Indian Health Service Headquarters** ) | |
| **The Reyes Building, 801 Thompson Avenue,** ) | |
| **Rockville, MD  20852,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff, the Redding Rancheria, makes and files this Complaint against Defendants and alleges as follows:

## THE PARTIES

1.     The Redding Rancheria (the "Tribe") is a federally-recognized Indian tribal government and a party to a government-to-government compact and funding agreement with the United States government pursuant to the Indian Self Determination and Education

Assistance Act ("ISDEAA").  The Tribe is located in Redding, California and the address of its Tribal Administration Office is:  2000 Redding Rancheria Road, Redding, CA 96001.

2.     Defendant Silvia Matthews Burwell is the Secretary of the United States Department of Health and Human Services ("HHS") and has overall responsibility for carrying out all of the functions, duties and responsibilities of HHS, including the provision of health care services to American Indians and Alaska Natives and negotiating and entering into agreements with Indian Tribes and Tribal organizations under ISDEAA.  She is sued in her official capacity. Her office address is:  U.S. Department of Health & Human Services, 200 Independence Avenue, SW, Washington, DC 20201.

3.     Defendant Yvette Roubideaux is the Acting Director of the Indian Health Service ("IHS") and is sued in her official capacity.  Acting Director Roubideaux exercises authority delegated to her by the Secretary of HHS to carry out the Secretary's responsibilities under the ISDEAA and other applicable law.  IHS is the agency within HHS responsible for providing, administering, and overseeing federal health services to American Indians and Alaska Natives. Her office address is:  Indian Health Service Headquarters, The Reyes Building, 801 Thompson Avenue, Rockville, MD, 20852.

## **JURISDICTION**

4.     The Court has jurisdiction over this action pursuant to 25 U.S.C. §§ 450m-1(a), 458aaa-10(a), 28 U.S.C. § 1331, and 28 U.S.C. § 2201.

5.     Venue is proper pursuant to 28 U.S.C. § 1391(e) because Defendant Burwell, sued in her official capacity on behalf of the United States, resides within this judicial district.

## **GENERAL ALLEGATIONS**

6.      At all times relevant to this Complaint, HHS and IHS (collectively referred to herein as "IHS" unless otherwise noted) are or were acting on behalf of the United States of America.

7.      At all times relevant to this Complaint, IHS is charged with providing health care to Indians and performing other duties that arise under the Indian Health Care Improvement Act ("IHCIA").

8.      At all times relevant to this Complaint, IHS is charged with administering ISDEAA contracts, compacts, and funding agreements.

9.      At all times relevant to this Complaint, IHS is charged with administering Catastrophic Health Emergency Fund ("CHEF") benefits in accordance with the IHCIA, 25 U.S.C. Section 1621a.

10.      On or about August 16, 2011, the Tribe and IHS entered into an ISDEAA compact and funding agreement (as updated from time to time) with regard to designated health services, including those governed by the IHCIA (collectively, the "Compact," unless otherwise noted).

11.      Health care services provided by the Tribe under the Compact include contract health care services ("CHS"), which are authorized through the Tribe's Contract Health Service Program (the "CHS Program") when referral to an outside entity is medically necessary and when other applicable criteria under 42 C.F.R. Part 136 are met.

12.      References in this Complaint to the Tribe include the Tribe's compacted health program under ISDEAA and its CHS Program where applicable.

## Federal Funding Shortfalls / PLR

13.     IHS does not provide sufficient federal funding to cover all needed health care for Tribal members.

14.     To help stretch these limited budgets, IHS implemented a "payer of last resort rule" (the "PLR") in 42 C.F.R. Part 136.61, pursuant to which CHS benefits will generally be paid only after the patient first exhausts any other coverage available through an "alternate resource."

15.     As part of the Affordable Care Act changes in 2010, the IHCIA was amended to make the PLR statutory.  *See* 25 U.S.C. § 1623.

16.     While the PLR saves federal and tribal health care budgets by requiring other alternate resources, like private insurance, to be the primary payers, the PLR is not intended to shift federal responsibility onto tribal governments who choose to supplement member care through tribal self-insurance.

17.     In this regard, IHS recognizes in its own CHS Manual, Section 2-3.8(I), that tribal self-insurance is an exception to the PLR consistent with Congressional intent not to burden Tribal resources:

> "The IHS is prohibited from seeking recovery when the health services provided to an eligible patient are covered by a self-insured health plan funded by a Tribe or Tribal organization under Section 206(f) of the IHCIA, P.L. 94-437, 25 U.S.C. §1621e(f).  Consistent with congressional intent not to burden Tribal resources, the Agency has made a determination that tribally-funded self-insured health plans are not to be considered alternate resources for purposes of the IHS' Payor of Last Resort Rule. . . ."

18.     There is also no requirement under the IHCIA or otherwise for a tribal government to establish a tribal self-insurance program for the benefit of its members, or to

cover care under a tribal self-insurance program that is otherwise eligible for reimbursement under CHS.

19.     Thus, tribal governments can establish self-insurance programs to supplement member care, and members remain eligible for CHS care (primary to tribal self-insurance) to the extent those benefits are funded.

## Tribal Supplemental Funding

20.     Tribes may provide supplemental funding through direct payments to their compacted CHS programs under ISDEAA, to enable those programs to provide more benefits than they would otherwise be able to cover solely with federal dollars.

21.     Tribes may also provide supplemental funding to their compacted CHS programs indirectly, by making primary payment on claims out of tribal self-insurance that would otherwise be payable through CHS.

22.     IHS has long recognized both of these methods of tribal supplemental funding.

## Establishment of Member Self-Insurance Program

23.     The Tribe established a self-insurance program for Tribal members (the "Supplemental Program") to provide supplemental care beyond what can be provided through available federal funding.

24.     The Supplemental Program is also designed to allow the Tribe the flexibility of providing supplemental funding to its compacted CHS Program by covering designated claims that would otherwise be covered through CHS.

25.     The Supplemental Program is funded with general assets of the Tribe and is structured as a tribal self-insurance program as defined in the IHCIA, 25 U.S.C. Section 1621e(f).

26.     The Tribe did not intend the Supplemental Program to relieve the federal government of any trust, statutory or other federal duties to fund, pay for or provide health care for Tribal members.

27.     Accordingly, the Tribe specifically included exclusionary and coordination of benefits provisions within the Supplemental Program to ensure that the Tribal program would not be required to pay primary for care that was already available to members through existing federal sources.

28.     The Tribe also took measures to ensure that all care available to members through its compacted CHS Program and the Supplemental Program was coordinated in an effort to maximize health care per every Tribal and federal dollar spent.

29.     The coordination efforts undertaken by the Tribe included, for example, use of professional claim administration services/fiscal intermediary services shared between the Redding CHS Program and the Supplemental Program, improved access to the Blue Cross network for care that the CHS program would otherwise pay at higher rates, and supplemental funding from the Tribe to increase the volume of care that could be approved through its CHS Program for care that could be provided more efficiently through CHS than through a private network.

30.     The Tribe's effort to coordinate member care is consistent with the expressed goals set forth in IHS's own CHS Manual, 2-3.21, which provides that "The purpose of managed care is to promote access to needed health care at the most affordable cost, maximize utilization of resources and alternate resources, and support greater continuity of care...."

31.     To ensure that providers receive prompt payment while benefits are coordinated between care that is available through the Tribe's CHS Program and/or the Supplemental

Program, the Tribe established procedures whereby the fiscal intermediary could pay claims through the Supplemental Program on a provisional basis pending completion of a coordination of benefits (COB) review to determine what program should pay primary.

32.     Under the COB process, if care is paid from the Supplemental Program that should have been covered by the CHS Program as primary payer, the fiscal intermediary is required to enforce an exclusionary clause that requires reversal of the provisional payment, and assumption by the CHS Program as the primary payer.

33.     Rather than requiring the health care providers to return provisional payments and to seek new payments from the CHS Program, however, the Tribe has implemented coordination procedures so that the CHS Program may reimburse the Supplemental Program for provisional payments actually paid to health care providers up to the amount that should have been paid directly through the CHS Program itself.

34.     The foregoing COB procedure is designed to place the CHS Program in the same position it would have been in had the Supplemental Program excluded all care up front, and had the Supplemental Program forced the health care provider to proceed through the CHS Program collection process from the start.

35.     However, by using the COB process, providers get paid more quickly and do not have to sort through different payment systems.  Tribal members also do not have to contend with collection notices often incident to non-coordinated exclusionary clauses.  The COB process also makes it easier for the Tribe to provide indirect supplemental funding for its CHS Program for categories of care that the Tribe elects to exempt from its exclusionary clause.

36.     Reimbursement under the Tribe's COB process is expressly limited to no more than the amount that the CHS Program would have paid in the absence of provisional payments

under the Tribe's Supplemental Program, and reimbursements are expressly limited to actual payments to providers of care to CHS eligible Tribal members.

37.     The Tribe's COB procedures do not allow the Supplemental Program to assume primary liability for CHS care that is eligible for federal CHEF reimbursements.

38.     Thus, if it is determined during the COB review that a provisional payment was made to a provider for CHS eligible care above the CHEF threshold, that provisional payment must be reversed.

39.     On information and belief, certain CHS programs operated by IHS itself do not treat tribal self-insurance as an alternate resource for care excluded under the terms of the self-insurance program.

40.     On information and belief, there are tribally operated CHS programs throughout the country that do not treat tribal self-insurance as an alternate resource for care excluded under the terms of the self-insurance program.

41.     On information and belief, IHS routinely grants CHEF reimbursements to IHS operated CHS programs for care excluded under a tribal self-insurance program.

42.     On information and belief, IHS routinely grants CHEF reimbursements to tribally operated CHS programs throughout the country for care excluded under a tribal self-insurance program.

## **Denied CHEF Applications**

43.     CHEF, established under 25 U.S.C. Section 1621a, helps to protect both federal and tribal CHS programs against large claims by providing additional federal funds for CHS claims that exceed designated annual claim amounts.

44.     In 2013, the Tribe submitted several CHEF applications for care that was provided through its CHS Program and exceeded the annual claim amount.

45.     The applications satisfied all requirements under CHEF, 25 U.S.C. § 1621a, for reimbursement:  (i) the costs of treatment exceeded the predetermined threshold amounts; and (ii) the health care costs qualified for and were paid from the Tribe's CHS program (including exhaustion of alternate resources).  There are no regulations promulgated pursuant to CHEF that further clarify, define, or add to the requirements of § 1621a.

46.     Subsection 1621a(d), of Title 25 of the United States Code requires the Secretary to promulgate regulations for the administration of CHEF.

47.     Despite the passage of 26 years since Congress added Section 1621a to the IHCIA in 1988, the Secretary has failed to promulgate any regulations as called for in 25 U.S.C. Section 1621a(d).

48.     In dereliction of its duty to promulgate regulations, IHS administers CHEF through "internal guidelines, rules and policies for the administration of CHEF" with no input or consultation from Tribes, and without any of the safeguards that tribes are entitled to in the development of regulations, including those required by the Administrative Procedures Act.

49.     On information and belief, IHS provides certain of its internal guidelines, rules and policies for the administration of CHEF to Tribes through "dear tribal leader" letters and memoranda.

50.     On information and belief, IHS also enforces additional internal guidelines, rules and policies for the administration of CHEF on an oral or an ad hoc basis as it sees fit.

51.     On information and belief, IHS' failure to develop regulations under CHEF results in inconsistent and discriminatory treatment among tribes and federally operated CHS programs.

52.     All CHEF applications submitted by the Tribe from 2013 forward have sought reimbursement only for costs that had been authorized under and paid through the Tribe's CHS Program.

53.     All reimbursements sought under the CHEF applications were for payments to outside medical providers for medically necessary care they provided to CHS beneficiaries, in accordance with the Tribe's CHS Program, applicable CHS law and regulations, and the Compact.

54.     All CHEF applications submitted by the Tribe met the statutory requirements for reimbursement under CHEF.

55.     All CHEF applications submitted by the Tribe met the written internal IHS guidelines, rules and policies for the administration of CHEF.

56.     On information and belief, IHS has published no regulations or other guidance under CHS indicating that excluded care under a tribal self-insurance program is ineligible for CHS if the tribal self-insurance program provides provisional coverage pending completion of a coordination of benefits review.

57.     On information and belief, IHS has published no regulations or other guidance under CHEF indicating that CHS payments are ineligible for CHEF reimbursement if a tribal self-insurance program provides provisional coverage pending confirmation of primary payment responsibility under the CHS program.

58.     On information and belief, IHS rejected all CHEF applications starting in 2013 for CHS care that went through the Tribe's COB process and that included any provisional payments initially fronted through the Tribe's Supplemental Program.

59.     Upon rejection of the Tribe's CHEF applications, the Tribe's CHS Program director promptly attempted to secure an explanation of the basis for the denials.

60.     On or about March 15, 2013, a phone conference was held between the Tribe and various IHS representatives (including Terri Schmidt, Toni Johnson, and Debra Feathers), during which IHS explained that the CHEF applications were denied because they included payments that were not CHS eligible payments made in accordance with IHS' internal agency guidelines regarding CHS payments (the "Federal CHS guidelines").

61.     During the March 15, 2013, phone conference, IHS would not provide a specific listing of alleged CHS deficiencies.  IHS representatives did, however, state their view that CHS payments from the Tribe must be made by individual paper checks to each health care provider rather than through electronic payment, and that spreadsheets attached to the Tribe's CHEF applications were in an incorrect font size.

62.     No statutes or regulations under CHS, ISDEAA, or IHCIA, and no Compact provisions, require CHS programs to pay health care providers by paper checks or to use a particular font size for spreadsheets attached to CHEF applications.

63.     No statutes or regulations under CHS, ISDEAA, or IHCIA, and no Compact provisions, prohibit CHS programs from reimbursing a tribal self-insurance program overpayment, for amounts the CHS program is otherwise obligated to pay.

64.     During the March 15th phone conference, the Tribe and IHS agreed that the Tribe's CHEF applications would be sent to the national IHS office on an expedited basis; that

an itemized list of alleged deficiencies would be sent to the Tribe following the national office's review; and that both parties would reconvene for a follow-up phone consultation as to what the Tribe would need to do to correct any perceived deficiencies.

65.    IHS failed to timely respond or to provide assistance for the Tribe to correct any perceived deficiencies.

### Consultation Requests / Executive order 13175

66.    On or about March 26, 2013, the Tribe submitted a formal written request for a government-to-government consultation with IHS in accordance with Executive Order 13175, including a request for administrative waiver of any IHS internal agency guidelines or regulations that IHS may be relying on to deny the Tribe's eligibility for CHEF, as provided for in Section 6 of Executive Order 13175.

67.    IHS failed to engage in meaningful consultation with the Tribe.

68.    On or about August 8, 2013, Dr. Roubideaux officially denied the Tribe's consultation and Executive Order 13175 requests without having engaged in any substantive discussions with the Tribe.

69.    The August 8, 2013 letter from IHS also confirmed that the reason IHS had denied the Tribe's request for reimbursements under CHEF was "because [IHS believed that] the Tribe used contract health services (CHS) funds to reimburse its Tribal self-insurance plan."  The letter further states that:

> "(1) the Tribe is seeking reimbursements for payments made to its Tribal self-insurance plan; (2) such payments are not valid CHS obligations; and (3) only valid CHS obligations are reimbursable under the CHEF. . . . the IHS has determined that the expenditures for which the Tribe is seeking reimbursement are not authorized CHS expenditures.  Accordingly, the denial of the Tribe' request is upheld."

70.     Thus, the grounds for denying CHEF reimbursements to the Tribe were based directly on the manner in which the Tribe was administering its compacted CHS Program under ISDEAA.

71.     On information and belief, IHS misunderstood the way that the Tribe operated its CHS Program and/or attempted to impose federal CHS guidelines for administering CHS that do not apply to the Tribe.

72.     On information and belief, IHS's misunderstanding was due in part to its failure to consult with the Tribe in good faith as required by Executive Order 13175.

73.     All reimbursements to the Supplemental Program were limited to amounts necessary to make the Supplemental Program whole for provisional payments made to providers for CHS authorized care.

74.     All reimbursements to the Supplemental Program were for CHS payments that met all applicable CHS statutory, regulatory, and Compact requirements.

## Administrative Exhaustion

75.     On or about October 15, 2013, the Tribe submitted to IHS (1) a Regulatory Waiver Request pursuant to 42 C.F.R. §§ 137.225-137.231 (*see also* 25 C.F.R. §§ 900.140 & 900.148) (the "Regulatory Waiver Request"); (2) a Final Offer pursuant to 25 U.S.C. § 458aaa-6 and 42 C.F.R. §§ 137.130-137.220 (*see also* 25 C.F.R. § 900.20) (the "Final Offer"); and (3) a claim pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101–7109 (the "CDA Claim").

## The Regulatory Waiver Request

76.     The Regulatory Waiver Request sought, in part, (i) a regulatory waiver from any IHS internal agency guideline, or any other procedure or legal requirement, that IHS alleges the

Tribe's CHS program violated; and (ii) a declaration that those internal agency guidelines, procedures, and legal requirements are superseded by the Tribe's assumption of CHS responsibilities under the Compact.

77.     On or about January 2, 2014, the Tribe again proposed a government-to-government consultation pursuant to Executive Order 13175 to discuss the Regulatory Waiver Request.

78.     On or about January 16, 2014, IHS denied the Regulatory Waiver Request.

79.     On or about February 14, 2014, the Tribe requested an informal conference to discuss the Regulatory Waiver Request, pursuant to 42 C.F.R. § 137.421 and Executive Order 13175.

80.     On or about March 11, 2014, IHS denied the Tribe's request for an informal conference.

**The Final Offer**

81.     The Final Offer requested approval of an amendment to the Tribe's Compact and funding agreement (the "Amendment"), which would have added language expressly clarifying the manner in which CHS benefits are administered and that coordination with the Tribe's self-insurance program could be accomplished consistent with applicable CHS rules.  In this regard, the amendment confirmed that the Tribe's CHS Program was not subject to federal CHS guidelines pursuant to 25 U.S.C. § 458aaa-16(e).

82.     On or about December 4, 2013, IHS rejected the Final Offer.

83.     If IHS rejects a Final Offer by an Indian tribe for a funding agreement or Compact amendment, the IHS is required to provide a written notification to the tribe that "clearly demonstrates" that:  "(i) the amount of funds proposed in the 'Final Offer' exceeds the applicable

funding level to which the Indian tribe is entitled under this part; (ii) the program, function, service, or activity (or portion thereof) that is the subject of the 'Final Offer' is an inherent Federal function that cannot legally be delegated to an Indian tribe; (iii) the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or (iv) the Indian tribe is not eligible to participate in self-governance . . . ." 25 U.S.C. § 458aaa-6(c)(1)(A).

84.     If IHS rejects a Final Offer, it is also required to provide technical assistance to the Indian tribe to assist the tribe in overcoming the IHS's objection.  25 U.S.C. § 458aaa-6(c)(1)(B).

85.     Moreover, in any civil action premised on the IHS's rejection of a Final Offer, IHS has the burden of demonstrating by clear and convincing evidence the validity of its grounds for rejecting the offer.  25 U.S.C. § 458aaa-6(d).

86.     IHS's rejection failed to meet the requirements of 25 U.S.C. Section 458aaa-6(c) or (d).

87.     At no time did the Tribe, in its proposed Amendment or otherwise, seek to increase its Compact funding level, let alone beyond what the Tribe is entitled to under ISDEAA and the IHCIA.

88.     At no time did the Tribe, in its proposed Amendment or otherwise, seek to Compact any new or additional programs, functions, services, or activities that are not already covered under the Compact.

89.     On or about January 2, 2014, the Tribe requested an informal conference.

90.     On or about January 2, 2014, the Tribe again suggested that the parties also engage in government-to-government consultation pursuant to Executive Order 13175.

91.     On or about February 5, 2014, IHS denied the Tribe's request for an informal conference.

92.     IHS has never agreed to engage in meaningful consultation or provide relief under Executive Order 13175.

93.     On information and belief, IHS routinely denies meaningful consultation to tribes by substituting "tribal delegation meetings" and "listening sessions" that do not satisfy Executive Order 13175, IHCIA, and/or ISDEAA.

## The CDA Claim

94.     The CDA applies to disputes arising from the Compact pursuant to 25 U.S.C. § 450m-1(d) and 42 C.F.R. § 137.412 (*see also* 25 C.F.R. § 900.216(a)).

95.     Under the Tribe's October 15, 2013, CDA Claim, the Tribe alleges violations of its Compact, including the fact that IHS has attempted to enforce non-statutory and non-regulatory requirements on its CHS Program, that IHS has refused to accept valid CHS payments under the Tribe's CHS Program, and that IHS is in breach of its Compact duty to consult with the Tribe in good faith.

96.     The Tribe also alleges that IHS is in breach of the Compact provisions regarding its duty to provide CHEF reimbursements, and that the Tribe has fully complied with all Compact requirements.

97.     On or about December 17, 2013, IHS denied all claims and damages in the CDA Claim.

98.     On or about January 2, 2014, the Tribe proposed a government-to-government consultation pursuant to Executive Order 13175 to discuss the CDA Claim.

99.     As of the date of this filing, IHS has failed to provide meaningful consultation as required by Executive Order 13175.

100.    The Tribe has exhausted all administrative requirements with respect to each of the claims asserted herein.

### Trust Responsibilities / Federal Health Care Goals

101.    In the ISDEAA, Congress affirmed the United States's trust responsibility with respect to Indian people.  25 U.S.C. § 450n.  More recently, in the IHCIA, Congress again affirmed the United States's trust responsibility.  IHCIA, 25 U.S.C. § 1601, states that "Federal health services to maintain and improve the health of the Indians are consonant with and required by the Federal Government's historical and unique legal relationship with, and resulting responsibility to, the American Indian people."  IHCIA further states that "[a] major national goal of the United States is to provide the resources, processes, and structure that will enable Indian tribes and tribal members to obtain the quantity and quality of health care services and opportunities that will eradicate the health disparities between Indians and the general population of the United States."  *Id.*

102.    In the IHCIA, Congress also affirms that these policies are "in fulfillment of its special trust responsibilities and legal obligations to Indians . . . to ensure the highest possible health status for Indians and urban Indians and to provide all resources necessary to effect that policy."  25 U.S.C. § 1602.  Section 1602 further provides that it is Congress's intent "that the United States and Indian tribes work in a government-to-government relationship to ensure quality health care for all tribal members [and] to provide funding for programs and facilities operated by Indian tribes and tribal organizations in amounts that are not less than the amounts provided to programs and facilities operated directly by the Service."  *Id.*

103.    IHS itself has also repeatedly acknowledged and confirmed the solemn trust and fiduciary responsibilities that it owes to Indian tribes.  For example:

a.    In a video currently available on the IHS website (available at http://www.ihs.gov/aboutihs/thedirector/), Dr. Roubideaux states, "As the Director of the Indian Health Service, I recognize that the provision of health care services through our agency is part of the federal trust responsibility to provide health care to American Indians and Alaska Natives."

b.    Also currently on the IHS website, on a page titled "Basis for Health Services" (available at http://www.ihs.gov/newsroom/factsheets/basisforhealthservices/), it states "The trust relationship establishes a responsibility for a variety of services and benefits to Indian people based on their status as Indians, including health care."

c.    In a May 14, 2014, speech before the Senate Indian Affairs Committee titled "Ensuring IHS is Living Up to Its Trust Responsibility," Dr. Roubideaux stated, "As you know, IHS plays a unique role in the Department of Health and Human Service (HHS) because it is a health care system that was established to meet the federal trust responsibility."

d.    On June 12, 2013, at a nomination hearing before the Senate Indian Affairs Committee, Dr. Roubideaux stated, "IHS has a solemn responsibility to honor the federal trust responsibility to provide health care."

e.    In a 2012 Tracking Accountability In Government Grants System Annual Report, Dr. Roubideaux wrote, "Compacts are written agreements consistent with the

federal government's trust responsibility, treaty obligations, and the government-to-government relationship between Indian tribes and the United States . . . ."

f.   In a September 7, 2010, editorial piece for the Buffalo Post (available at http://www.buffalopost.net/?p=11696#more-11696), Dr. Roubideaux wrote, "The IHS rarely is mentioned in the national media, but it serves a critically important role to address the health disparities faced by American Indians and Alaska Natives.  Many Americans do not understand the role of this health care system, or the treaty obligations and trust responsibilities that led to its formation over 50 years ago."

104.   The IHCIA states that "[a] major national goal of the United States is to provide the quantity and quality of health services which will permit the health status of Indians to be raised to the highest possible level and to encourage the maximum participation of Indians in the planning and management of those services."  25 U.S.C. § 1601(3).

105.   The IHCIA also provides that it is the "policy of this Nation, in fulfillment of its special trust responsibilities and legal obligations to Indians":

a.   "to ensure the highest possible health status for Indians and urban Indians and to provide all resources necessary to effect that policy;"

b.   "to ensure maximum Indian participation in the direction of health care services so as to render the persons administering such services and the services themselves more responsive to the needs and desires of Indian communities;"

c.   "to require that all actions under this chapter shall be carried out with active and meaningful consultation with Indian tribes and tribal organizations, and

conference with urban Indian organizations, to implement this chapter and the national policy of Indian self-determination;" and

d.      "to ensure that the United States and Indian tribes work in a government-to-government relationship to ensure quality health care for all tribal members."  25 U.S.C. §§ 1602(1), (3), (5)–(6).

106.    Section 450a(a), Title 25, of the United States Code provides as follows: "Congress hereby recognizes the obligation of the United States to respond to the strong expression of the Indian people for self-determination *by assuring maximum Indian participation* in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities."  (Emphasis added.)

107.    Section 450a(b), Title 25, of the United States Code provides as follows:

Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians *to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services*.  In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities.  (Emphasis added.)

108.    Section 2 of Executive Order 13175 provides that "[i]n formulating or implementing policies that have tribal implications, agencies shall be guided by the following fundamental principles":

a.      "The United States has a unique legal relationship with Indian tribal governments.

. . .  Since the formation of the Union, the United States has recognized Indian

tribes as domestic dependent nations under its protection. The Federal Government has enacted numerous statutes and promulgated numerous regulations that establish and define a trust relationship with Indian tribes."

b.      "Our Nation . . . has recognized the right of Indian tribes to self-government. As domestic dependent nations, Indian tribes exercise inherent sovereign powers over their members and territory. The United States continues to work with Indian tribes on a government-to-government basis to address issues concerning Indian tribal self-government, tribal trust resources, and Indian tribal treaty and other rights."

c.      "The United States recognizes the right of Indian tribes to self-government and supports tribal sovereignty and self-determination."

109.    Section 3 of Executive Order 13175 provides that, in addition to adhering to the fundamental principles set forth in section 2, agencies shall adhere to the following criteria, to the extent permitted by law, when formulating and implementing policies that have tribal implications:

a.      "Agencies shall respect Indian tribal self-government and sovereignty, honor tribal treaty and other rights, and strive to meet the responsibilities that arise from the unique legal relationship between the Federal Government and Indian tribal governments."

b.      "With respect to Federal statutes and regulations administered by Indian tribal governments, the Federal Government shall grant Indian tribal governments the maximum administrative discretion possible."

c.     "When undertaking to formulate and implement policies that have tribal implications, agencies shall:  encourage Indian tribes to develop their own policies to achieve program objectives; where possible, defer to Indian tribes to establish standards; and in determining whether to establish Federal standards, consult with tribal officials as to the need for Federal standards and any alternatives that would limit the scope of Federal standards or otherwise preserve the prerogatives and authority of Indian tribes."

110.    Section 5 of Executive Order 13175 requires each agency to have "an accountable process to ensure meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications."  It goes on to state that "[t]o the extent practicable and permitted by law, no agency shall promulgate any regulation that has tribal implications, that imposes substantial direct compliance costs on Indian tribal governments, and that is not required by statute, unless:  1. funds necessary to pay the direct costs incurred by the Indian tribal government or the tribe in complying with the regulation are provided by the Federal Government; or 2. the agency, prior to the formal promulgation of the regulation."  Section 5 also requires an agency to consult with tribal officials early in the process of developing any proposed regulation that has tribal implications.

111.    IHS is also under a statutory duty to consult with the Tribe in good faith under 25 U.S.C. § 458aaa-6(e) over all Compact issues addressed in this litigation, which IHS has failed to do:

> In the negotiation of compacts and funding agreements the Secretary shall at all times negotiate in good faith to maximize implementation of the self-governance policy.  The Secretary shall carry out this part in a manner that maximizes the policy of tribal self-governance, in a manner consistent with the purposes specified in section 3 of the Tribal Self-Governance Amendments of 2000.

112.     The Tribe has made efforts to improve the health care of its members by coordinating care between all available resources.

113.     IHS has failed to meet its responsibilities to work with the Tribe to improve member care and has in fact hindered the Tribe's ability to make such improvements by insisting that the Tribe continue costly and inefficient health care practices such as the payment of CHS care with paper checks rather than use of electronic payments, and IHS's reluctance to allow any coordination of member care between CHS and tribal self-insurance.

### IHS Circulars, Policies, Manuals, Guidance and Rules

114.     Section 458aaa-16(e), Title 25, of the United States Code provides as follows: "Unless expressly agreed to by the participating Indian tribe in the compact or funding agreement, the participating Indian tribe shall not be subject to any agency circular, policy, manual, guidance, or rule adopted by the Indian Health Service, except for the eligibility provisions of section 450j(g) of this title and regulations promulgated under this section."

115.     42 C.F.R. § 137.5 provides that:   "[u]nless expressly agreed to by the Self-Governance Tribe in the compact or funding agreement, the Self-Governance Tribe shall not be subject to any agency circular, policy, manual, guidance, or rule adopted by the IHS, except for the eligibility provisions of section 105(g) of the Act and regulations promulgated under section 517 of the Act."

116.     Section 11, pages 6–7 of the Compact provides that the Tribe and Secretary of HHS agree that the following procedures will govern the establishment and application of the Tribe's CHS program rules and regulations:

a.     "In accordance with Section 517(e) of Title V [of the ISDEAA], Tribe shall not be subject to any circular, policy, manual guidance, or rule adopted by the Indian

Health Service, except for the eligibility provisions of section 105(g) of the [ISDEAA] and regulations promulgated under Section 517 of Title V."

b.     "The Title V regulations shall apply to this [Compact] unless the Tribe submits a request for waiver in accordance with the procedure set forth in Section 512(b) of Title V and the Title V implementing regulations."

The Compact further provides that "[i]n accordance with Section 512(b) of Title V, the Tribe may submit a written request to waive application of a regulation promulgated under Section 517 of Title V or the authorities specified in section 505(b) for this [Compact] or the Funding Agreement, to the Secretary identifying the applicable Federal regulation sought to be waived and the basis for the request."

## Other Statutory and Regulatory Duties of IHS

117.     42 C.F.R. § 137.6, calls for IHS to support "the self-determination choices of each Tribe [and] to work with all Tribes on a government-to-government basis to address issues concerning Tribal self-determination." IHS has failed to work with the Tribe in accordance with 42 C.F.R. §§ 137.6, 137.5 and 137.2.

118.     In construing the Compact and reviewing the Tribe's effort to improve and coordinate member care, IHS was under a duty to construe the Compact and statutes at issue in favor of the Tribe under 25 U.S.C. § 458aaa-11(a):

Except as otherwise provided by law, the Secretary shall interpret all Federal laws, Executive orders, and regulations in a manner that will facilitate (1) the inclusion of programs, services, functions, and activities (or portions thereof) and funds associated therewith, in the agreements entered into under this section; (2) the implementation of compacts and funding agreements entered into under this part; and (3) the achievement of tribal health goals and objectives.

IHS failed to do so.

119.    In construing the Compact and reviewing the Tribe's effort to improve and coordinate member care, IHS was under a duty to construe the Compact and statutes at issue in favor of the Tribe under 25 U.S.C. § 458aaa-11(f):

> Each provision of this part and each provision of a compact or funding agreement shall be liberally construed for the benefit of the Indian tribe participating in self-governance and any ambiguity shall be resolved in favor of the Indian tribe.

IHS failed to do so.

120.    The IHCIA and ISDEAA, and the regulations issued thereunder, are replete with references to the government's duties to consult with tribes, to work with tribes in promoting and encouraging self-determination, to encourage tribes to develop health care programs to meet the specific needs of their tribal members, and confirmation that the federal government's health care duties arise out of trust responsibilities and special obligations to Indians with regard to health care.  The Tribe asserts its rights under all such ISDEAA and IHCIA provisions and regulations and does not limit its rights to the provisions specifically cited and quoted within the text of this Complaint.

## FIRST CAUSE OF ACTION

### (Violation of 25 U.S.C. § 458aaa-6; Failure to Approve Amendment)

121.    The Tribe incorporates all previous allegations of fact and law into this Cause of Action.

122.    The Tribe properly followed the procedure for making its Final Offer to IHS pursuant to 25 U.S.C. § 458aaa-6(b) and the applicable federal regulations thereunder.

123.    IHS has rejected the Tribe's Final Offer for an amendment to its Compact and funding agreement, but has not clearly demonstrated that any of the permissible statutory bases for rejection apply.  Accordingly, IHS has violated 25 U.S.C. § 458aaa-6.

124.     IHS has rejected the Tribe's Final Offer for an amendment to its Compact and funding agreement, but has not provided any technical assistance to the Tribe to overcome IHS's objection, despite the Tribe's repeated requests for consultation and assistance.  Accordingly, IHS has violated 25 U.S.C. § 458aaa-6.

125.     Based on the foregoing, the Tribe is entitled to approval of the proposed amendment submitted to IHS in its Final Offer.

126.     The Tribe is also entitled to CHEF reimbursements for all CHS claims properly paid in accordance with the Tribe's CHS procedures, the Compact and applicable law.

## SECOND CAUSE OF ACTION

### (Violation of 25 U.S.C. § 458aaa-6; Failure to Sever)

127.     The Tribe incorporates all previous allegations of fact and law into this Cause of Action.

128.     When the Secretary rejects a tribe's Final Offer, ISDEAA requires the Secretary to provide the Indian tribe with the option of entering into the severable portions of a compact or funding agreement that the Secretary did not reject, subject to alterations necessary to conform the agreement to the severed provisions.  25 U.S.C. § 458aaa-6(c)(D).

129.     Many portions of the proposed amendment were not disputed in IHS's rejection and could have been accepted as part of the Tribe's final Compact and funding agreement, and severed from disputed portions thus limiting the scope of this litigation.

130.     When the Secretary rejects a tribe's Final Offer, 42 C.F.R. § 137.421 requires the Secretary to provide the Indian tribe with an informal conference to resolve a Final Offer dispute.

131. An informal conference would have provided an opportunity for the parties to address severable portions of the proposed amendment as well as technical assistance and other means to limit the issues now in litigation.

132. IHS refused to grant an informal conference.

133. IHS failed to allow the Tribe to sever any portions of the proposal.

134. As a result, the Tribe is entitled to a declaration that IHS has violated 25 U.S.C. §§ 458aaa-6 and 42 C.F.R. § 137.421. The Tribe is also entitled to an injunction compelling IHS to sever the undisputed portions of the proposed amendments to the Compact and funding agreement and to enter into a conformed agreement with the Tribe regarding the severed portions.

### THIRD CAUSE OF ACTION

**(Breach of Contract/Compact—Failure to Accept CHS Payments)**

135. The Tribe incorporates all previous allegations of fact and law into this Cause of Action.

136. The Tribe has contracted to provide CHS services in accordance with the Compact.

137. The Tribe has provided CHS services in accordance with the Compact, IHCIA, ISDEAA and applicable laws and regulations.

138. IHS has refused to treat CHS payments from the Tribe as contract health service payments in violation of the Compact.

139. IHS has refused to consult with the Tribe in good faith as required by the Compact, IHCIA, ISDEAA and applicable laws and regulations.

140.    As a result, the Tribe has suffered damages in the amount of all CHEF denials based on IHS's refusal to treat CHS payments from the Tribe as contract health service payments eligible for reimbursement under CHEF.

## FOURTH CAUSE OF ACTION

### Breach of Trust / Breach of Fiduciary Duty

141.    The Tribe incorporates all previous allegations of fact and law into this Cause of Action.

142.    The ISDEAA, 25 U.S.C. § 450n, 25 U.S.C. § 458aaa-4, 25 U.S.C. §§ 458aaa-5, 25 U.S.C. § 458aaa-6(c)(1)(B), 25 U.S.C. § 458aaa-6(f), and its regulations, 42 C.F.R. § 137.2; 42 C.F.R. § 137.3; 42 C.F.R. § 137.144; the IHCIA, 25 U.S.C. §§ 1601, 1602; and the ISDEAA Compacts between IHS and the Tribe impose specific fiduciary duties on the United States, IHS, and HHS to work with the Tribe to coordinate and improve health care delivery to members, and to consult with the Tribe on such matters in good faith.  The existence of these specific fiduciary duties is buttressed by Executive Order 13175 and the general trust relationship between the United States and the Tribe as evidenced by IHS's and Dr. Roubideaux's repeated mention of such a relationship.

143.    By the foregoing acts and omissions IHS has breached its common law and statutory fiduciary duties to the Tribe.

## FIFTH CAUSE OF ACTION

### Breach of ISDEAA

144.    The Tribe incorporates all previous allegations of fact and law into this Cause of Action.

145.    The Tribe has a right under 25 U.S.C. Section 458aaa-5(e) to design its own CHS payment process.

146.    The Tribe has determined that the COB process between its compacted CHS Program and its Supplemental Program is "in the best interest of the health and welfare of the Indian community being served."

147.    IHS has relied on agency guidelines and policies to determine that the Tribe's CHS payment process is "unauthorized" and "invalid" because of the Tribe's COB process.

148.    This is contrary to long-standing IHS policy exempting tribal self-insurance programs from the PLR.

149.    It is also contrary to 25 U.S.C. § 458aaa-16(e) and the Tribe's right under 25 U.S.C. § 458aaa-5(e) to design its own CHS payment process.

150.    As of result of the foregoing breaches, acts and omissions, the Tribe is entitled to appropriate relief including money damages and injunctive relief against any action by an officer of the United States or any agency thereof contrary to the ISDEAA.

151.    Moreover, as the ISDEAA specifically provides for injunctive relief, the Tribe need not demonstrate the traditional equitable grounds for obtaining injunctive relief.

## SIXTH CAUSE OF ACTION

### Declaratory Relief

152.    The Tribe incorporates all previous allegations of fact and law into this Cause of Action.

153.    In light of the foregoing issues in controversy, the Tribe seeks the following declarations of law:

a.   That the Tribe's CHS Program is not subject to IHS circulars, policies, manuals, guidance, or rules with regard to approval of CHS payments and coordination of benefits between the Tribe's CHS Program and its Supplemental Program.

b.   That tribal self-insurance is not an alternate resource that would disqualify CHS eligibility under the PLR.

c.   That the Tribe is not required to cover CHS eligible care under its self-insurance program.

d.   That the Tribe is not prohibited under IHCIA, ISDEAA, or other applicable law from providing supplemental funding to its CHS Program directly or by covering CHS eligible care through tribal self-insurance.

e.   That the Tribe's CHS Program may reimburse tribal self-insurance for provisional payments for which the CHS Program was primarily liable.

f.   That the Tribe may coordinate benefits between its Supplemental Plan and its CHS Program to ensure that tribal dollars pay secondary to federal dollars.

g.   That IHS has a trust responsibility for the provision of health care to Indians under the IHCIA and ISDEAA, which includes a duty to consult with tribes in good faith.

h.   That IHS internal agency guidelines, rules and policies for the administration of CHS are superseded by the Tribe's assumption of CHS responsibilities under the Compact.

i.   That IHS cannot use internal agency guidelines, rules and policies for the administration of CHS to deny tribal CHS programs access to CHEF.

j.     That IHS is in breach of its statutory and trust duties for failing to promulgate regulations under CHEF.

k.     That IHS's acts and omissions as above alleged violate 25 U.S.C. § 1621e(f).

l.     That IHS's acts and omissions as above alleged violate 25 U.S.C. § 1623(b).

m.     That IHS's acts and omissions as above alleged violate 25 U.S.C. § 1621a.

n.     That IHS's acts and omissions as above alleged violate 25 U.S.C. § 458aaa-16(e).

154.   The foregoing allegations present an actual, justiciable controversy that is ripe for review.

155.   A declaration will serve a useful purpose in clarifying and settling the legal relations at issue.  It will terminate proceedings between the Tribe and IHS, as well as afford relief from the uncertainty and controversy faced by the parties.

156.   A declaration in the Tribe's favor is also in furtherance of public policy, as stated in the ISDEAA and 25 U.S.C. §§ 450–450a.

**WHEREFORE**, Plaintiff requests that this Court enter judgment in favor of Plaintiff, the Tribe, granting the following relief:

1.     Declaratory relief as requested above;

2.     Injunctive relief as requested above;

3.     Monetary damages equal to all CHEF reimbursements that have been improperly denied;

4.     All costs, fees, and other damages as a result of IHS's breaches; and

5.     Any and such other relief the Court deems proper.

OF COUNSEL:

Chimera N. Thompson
DORSEY & WHITNEY LLP
1801 K Street, N.W., Suite 750
Washington, D.C.  20006
Telephone:  (202) 442-3534
Fax:  (202) 442-3199

Vernle "Skip" Durocher
James K. Nichols
Forrest K. Tahdooahnippah
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500,
Minneapolis, MN  55402-1498
Telephone:  (612) 340-2600
Fax:  (612) 340-2868

Robert R. Yoder
YODER & LANGFORD, P.C.
5080 North 40th Street, Suite 339
Phoenix, AZ  85018
Telephone:  (602) 808-9578
Fax:  (602) 468-0688

DATE: December 2, 2014

/s/ Creighton R. Magid
Creighton R. Magid (DC Bar No. 476961)
DORSEY & WHITNEY LLP
1801 K Street, N.W., Suite 750
Washington, D.C.  20006
Telephone:  (202) 442-3555
Fax:  (202) 442-3199
magid.chip@dorsey.com

Attorneys for Plaintiff Redding Rancheria