# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                         )

**REDDING RANCHERIA,**         )
**a federally recognized Indian tribe,**   )
                         )
        **Plaintiff,**            )
                         )
        **v.**                  )     **Civil Action No. 14-2035 (RMC)**
                         )
**ERIC D. HARGAN, Acting Secretary,**  )
**United States Department of Health and**  )
**Human Services,** *et al.,*         )
                         )
        **Defendants.**          )
_____ )

## OPINION

The provision of health care for American Indians has historically been, and remains, plagued by chronic funding shortages and ineffective provision of services. A 2003 report from the United States Commission on Civil Rights found:

> The unmet health care needs of Native Americans remain among the most severe of any group in the United States. Despite their need for health care and although there are designated health services, the monetary value of Native American care is significantly less than the average health expenditure for all Americans. [The Indian Health Service's] real spending per Native American, after adjusting for inflation and population growth, has fallen over time, despite funding increases.[1]

This case arises out of the Redding Rancheria Tribe's attempt to create a tribally-funded self-insurance program and coordinate its benefits with those available from the Indian Health Service to make efficient use of all available resources. The Tribe has attempted to obtain reimbursement for health services provided by its compact with the federal government under the Indian Self-Determination and Education Assistance Act. The Department of Health

---

[1] U.S. Comm'n on Civil Rights, A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country 42 (2003).

and Human Services and its constituent agency the Indian Health Service have repeatedly refused to consider the Tribe's reimbursement requests because they dispute the legitimacy of the Tribe's coordination of federal benefits with its self-insurance program. IHS insists that it is barred from reimbursing the Tribe due to a payor of last resort provision in the Indian Health Care Improvement Act, 25 U.S.C. §§ 1601 *et seq.* (2012), as amended by the Affordable Care Act in 2010.

Having reviewed the entire record, the Court concludes that the agency's interpretation of the payor of last resort provision is inconsistent with a plain reading of the statute and congressional intent, and will remand to IHS for reconsideration of the Tribe's requests for reimbursement in a manner consistent with this opinion.

## I.  FACTS

### A.  The Tribe's Compact and Funding Agreement

Congress enacted the Indian Self-Determination and Education Assistance Act (ISDEAA), 25 U.S.C. §§ 5301 *et seq.*, in recognition of "the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of . . . Federal services to Indian communities." *Id.* § 5302(a). The establishment of a "meaningful self-determination policy" was designed to "permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." *Id.* § 5302(b). Consistent with these aims, the ISDEAA creates a mechanism for the negotiation of self-determination contracts:

> The Secretary is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof.

*Id.* § 5321(a)(1). "Under a self-determination contract, the federal government supplies funding to a tribal organization, allowing [the Tribe] to plan, conduct and administer a program or service that the federal government otherwise would have provided directly." *FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995).

On August 16, 2011, the Redding Rancheria Tribe entered into a self-determination contract (the Compact) with IHS along with an accompanying Funding Agreement in order "[t]o enable the Redding Rancheria Tribe to redesign programs, activities, functions and services of the Indian Health Service." Compact [Dkt. 45-1] at IHS000323. The Funding Agreement "obligates the Tribe to be responsible for and to provide health programs, functions, services and activities." Funding Agreement [Dkt. 45-1] at IHS000313 (FA). One of the programs transferred to the Tribe's administration was the Contract Health Services program (CHS).

CHS pays for "health services provided at the expense of the Indian Health Service from public or private medical or hospital facilities other than those of the Service." 42 C.F.R. § 136.21 (2017). CHS pays only for services that are medically necessary and "not reasonably accessible or available" through an IHS or tribal facility. *Id.* § 136.23. CHS is not an entitlement program and is limited to the available funding from Congress. As such, CHS is a "payor of last resort," and must determine, before paying for medical services, that there is no alternative source of payment for which an Indian is eligible. 25 U.S.C. § 1623. "Alternate resources" include Medicare, Medicaid, and private insurance. 42 C.F.R. § 136.61(c).

Because CHS funds are limited, Congress established the Catastrophic Health Emergency Fund (CHEF) in 1988, which is administered by the Secretary through IHS "for the purpose of meeting the extraordinary medical costs associated with the treatment of victims of

disasters or catastrophic illnesses who are within the responsibility of IHS." S. Rep. No. 100-508, at 6193 (1988). CHS programs are reimbursed by CHEF if the cost of treatment for an individual exceeds a threshold amount of $25,000. *See* 25 USC § 1621a(d)(2). Article IV, section 4 of the Tribe's Compact provides that "the United States will maintain the Tribe's eligibility for [CHEF] money." Compact at ISH000335.

In addition to its CHS program, in January 2012, the Tribe established its own Tribal Self-Insurance Program (referred to in the record as TSIP) to increase the availability of monies for health care for Tribal members. The Tribal Self-Insurance Program provides access to care at discounted rates through an arrangement with Anthem Blue Cross. In comparison, CHS reimburses health care providers at Medicare-like rates. For certain care needs, the Tribal Self-Insurance Program can purchase coverage at lower rates while for other needs, CHS is able to obtain a lower rate. To conserve resources so the Tribe pays the lowest possible rate, the Tribal Self-Insurance Program contains an exclusionary clause that excludes from coverage those services that are eligible for Medicare-like rates and those services eligible for CHEF reimbursements. Master Plan Document [Dkt. 45-2] at IHS000420-21. The TSIP Coordination Policy further provides that the Tribal Self-Insurance Policy "will not be treated as an alternate resource" for purposes of the payor of last resort rule. TSIP Coordination Policy [Dkt. 45-3] at IHS000489.

While the Tribe was sometimes able to secure the best rate by paying for care through the CHS program, for other care more favorable rates could be secured if the Tribe paid directly. *See* Tribe's Mot. for Summ. J. [Dkt. 34] at 2. To take advantage of the optimal rate, the Tribe also developed a Coordination of Benefits (referred to in the record as COB) program between the Tribal Self-Insurance Program and CHS, allowing the former to "pay any claim

otherwise covered by the express terms of [TSIP] on a provisional basis pending a final determination under the COB." Master Plan Document at IHS000482. In the event that the Tribal Self-Insurance Program makes a provisional payment and "it is confirmed that IHS or CHS should have been primary under this COB . . . [TSIP] shall be entitled to reimbursement for the IHS or CHS program." *Id.* If the provisional payment turns out to be for care eligible for Medicare-like rates under CHS, the Tribal Self-Insurance Program makes an immediate payment "on behalf of and as a distribution agent for the CHS program" in order to maintain eligibility for the Medicare-like rates. *Id.* By having its self-insurance program make immediate, but provisional, payments on behalf of CHS, the Tribe increases the fiscal efficiency of its payment process and conserves resources by ensuring that it will always pay the lowest available rate.

### B. The Tribe's CHEF Applications

In 2012 and 2013, the Tribe submitted six CHEF applications for care that was covered by the Tribe's CHS program and eligible for CHEF reimbursement. *See* Tribe's Mot. for Summ. J. at 12. For each of these applications, the Tribal Self-Insurance Program had made provisional payments until it could be determined what program was the primary payor. *See id.* at 12-13. Once it was determined that the charges were CHS obligations, CHS reimbursed the Tribe's insurance program and submitted the six CHEF applications. *See id.* When the Tribe did not receive any response, it contacted CHEF and arranged a teleconference with IHS on March 15, 2013. *See* Declaration of Tracy Edwards [Dkt. 45-4] at Redding001861 (Edwards Decl.). IHS took the position that the CHEF applications could not be processed because CHEF cannot reimburse payments to a tribal self-insurance plan, but can only reimburse valid CHS payments. *See id.* at Redding001861-62. IHS insisted that the CHS program should have paid vendors directly with paper checks issued by CHS. *See* First Request for Consultation [Dkt. 45-1] at

IHS000013. IHS also noted some technical problems with the applications including payment of reimbursements without paper checks, the use of a separate Excel spreadsheet, and the use of a different font size. *See* Edwards Decl. at Redding001863. The Tribe explained that all the applications were for valid CHS benefits and that the Tribal Self-Insurance Program had made provisional payments in accord with its coordination of benefits system. *See* First Request for Consultation at IHS000011; Edwards Decl. at Redding001862. On a follow-up call held on March 21, 2013, IHS provided no further insight into the denial of the CHEF applications. *See id*.

### C. The Request for Consultation and Administrative Waiver

On March 26, 2013, the Tribe requested a consultation regarding its CHEF applications and to clarify its coordination of benefits. *See* First Request for Consultation at IHS000010-22. The Tribe challenged the reasons given by IHS for denying the CHEF applications as not based on any statutory or regulatory requirement. *See id*. at IHS000015. Alternatively, it argued that it was entitled to an administrative waiver.[2] *See id*. at IHS000018.

Again receiving no response, the Tribe submitted a follow-up request for consultation on April 10, 2013. *See* Second Request for Consultation [Dkt. 45-1] at IHS000302. After a series of exchanges, IHS attended a Tribal Delegation Meeting on June 5, 2013, after

---

[2] Section 6(b) of Executive Order No. 13175, 65 Fed. Reg. 67249 provides:

> Each agency shall, to the extent practicable and permitted by law, consider any application by an Indian tribe for a waiver of statutory or regulatory requirements in connection with any program administered by the agency with a general view toward increasing opportunities for utilizing flexible policy approaches at the Indian tribal level in cases in which the proposed waiver is consistent with the applicable Federal policy objectives and is otherwise appropriate.

which the Tribe re-submitted its CHEF applications to resolve the technical formatting issues. *See* Tribe's June 5, 2013 Letter [Dkt. 45-1] at IHS000526.

On June 13, 2013, IHS indicated that the Tribe's re-submitted applications were under review and that IHS was working to schedule a "30-minute meeting" between Redding Rancheria and the IHS Director. IHS's June 13, 2013 Letter [Dkt. 45-1] at IHS000528. In response, the Tribe clarified that it was requesting "meaningful dialogue between two governments to address substantive issues," and not merely a "30-minute meeting." Tribe's June 18, 2013 Letter [Dkt. 45-1] at IHS000529. No meeting occurred. *See* Compl. [Dkt. 1] at 12.

By letter dated August 8, 2013, IHS Acting Director Dr. Yvette Roubideaux confirmed that IHS had again denied the Tribe's CHEF applications because: "(1) the Tribe is seeking reimbursement for payments made to its Tribal self-insurance plan; (2) such payments are not valid CHS obligations; and (3) only valid CHS obligations are reimbursable under the CHEF." IHS's August 8, 2013 Decision Letter [45-1] at IHS000076 (CHEF Decision Letter). Dr. Roubideaux indicated that IHS would "coordinate consultation as requested in the March 26, 2013-dated letter" from the Tribe. *Id.* at IHS000077.

Dr. Roubideaux denied the Tribe's request for an administrative waiver because it was "inconsistent with the Agency's statutory responsibility to maintain procedures governing the reimbursement of the CHEF." *Id.* at IHS000077. IHS asserted that it was required to "ensure that all CHS programs are given the same opportunity to seek reimbursement . . . [and] treated in a fair and uniform manner" and it could not, therefore, waive administrative requirements for the Tribe. *Id.*

### D.  The Second Request for Waiver

On October 15, 2013, the Tribe again submitted a request for a regulatory "waiver of the specific procedures and regulatory or other legal requirements, if any, that IHS has relied upon in its August 8, 2013 denial."  Request for Waiver Letter [Dkt. 45-2] at IHS000506.

By letter dated January 16, 2014, IHS again rejected the Tribe's waiver request, this time on the theory that regulatory waivers only apply to regulations that implement the ISDEAA.  *See* Denial of Second Request for Waiver [Dkt. 45-3] at IHS000503.  IHS reasoned that the administration of CHEF is outside the scope of the ISDEAA and its implementing regulations so that the regulatory waiver process is inapplicable to CHEF guidelines.  *See id.* at IHS000501.

### E.  The Final Offer

On October 15, 2013, the Tribe submitted a Final Offer pursuant to the ISDEAA, which provides "[i]n the event the Secretary and a participating Indian tribe are unable to agree . . . on the terms of a compact or funding agreement . . . , the Indian tribe may submit a final offer to the Secretary."  25 U.S.C. § 5387; Final Offer Letter [Dkt. 45-1] at IHS000107.  The Final Offer requested approval of an amendment to the Compact and Funding Agreement that would clarify "the Tribe's understanding of its Compact rights to coordinate member care and its exemption from IHS guidance, manuals, and rules . . . that have been applied to prevent that coordination."  Final Offer Letter at IHS000108.

In a letter dated December 4, 2013, IHS rejected the Tribe's Final Offer.  *See* Denial of Final Offer [Dkt. 45-2] at IHS000098.  Under the ISDEAA, if the Secretary rejects a final offer, "the Secretary shall provide timely written notification to the Indian tribe that contains a specific finding that demonstrates" one of four criteria.  25 U.S.C. § 5387(c)(1).  IHS

denied the Tribe's Final Offer, relying on two of the criteria: (1), "the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled," and (2), "the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe." *Id.* § 5387(c)(1)(A)(i) and (ii).

### F. The Contract Disputes Act Claim

On October 15, 2013, the Tribe submitted a claim to IHS under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109. The CDA Claim alleged that, by enforcing internal agency rules against the Tribe's CHS program and failing to consult with the Tribe, IHS was "in breach of its duties under the Compact, ISDEAA, and [Indian Health Care Improvement Act]." CDA Claim [Dkt. 45-1, 45-2] at IHS000024-25. In a letter dated December 17, 2013, IHS rejected the Tribe's CDA claim. *See* Denial of CDA Claim [Dkt. 45-2] at IHS000001.

## II. LEGAL STANDARDS

### A. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "In a case involving review of a final agency action under the Administrative Procedure Act [APA], however, the standard set forth in Rule 56[ ] does not apply because of the limited role of a court in reviewing the administrative record." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006). The APA requires Courts to hold unlawful agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Although this case is not brought under the APA, the ISDEAA does not specify the standard of review for claims brought under the statute and district courts are divided on the appropriate standard. At a September 11, 2015 status conference, this Court determined, and the parties agreed, that the appropriate legal standard in this case is *de novo* review. *See* Defs.' Mot. for Summ. J. [Dkt. 31] at 19. IHS now argues that the appropriate standard for phase one of this suit, covering Counts 1-3 and 5-6,[3] is the APA's arbitrary and capricious standard of review. *See id.* at 19-20.

In *Citizen Potawatomi Nation v. Salazar*, a court in this district applied the APA's arbitrary and capricious standard of review to an ISDEAA claim based on the general rule "that where a statute does not provide a standard of review . . . courts must look to the APA standard." 624 F. Supp. 2d 103, 108 (D.D.C. 2009) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715 (1963)). In *Seneca Nation of Indians v. Department of Health and Human Services*, this Court applied a *de novo* standard of review to an ISDEAA claims, citing several other district courts that had applied the same standard. 945 F. Supp. 2d 135, 141-42 (D.D.C. 2013). *Seneca Nation* distinguished *Citizen Potawatomi* on two bases: first, in *Seneca Nation*, the tribe brought claims under only the ISDEAA, not the APA; and second, the government agency in *Seneca Nation* conceded that *de novo* review was appropriate.

---

[3] The parties have agreed to bifurcate the Tribe's claims into two phases. Phase one includes the Tribe's claims relating to IHS's decision to decline the Tribe's Final Offer and its subsequent failure to sever portions of the compact or hold an informal conference (Counts 1 and 2), the failure to treat the Tribe's payments as valid CHS payments in violation of the Compact, IHCIA, and ISDEAA (Count 3), the failure to allow the Tribe to design its own health care program, as provided for in the ISDEAA (Count 5), and the request for declaratory relief on the meaning of certain relevant legislation (Count 6). Phase two will include the Tribe's claims that IHS breached its trust duties to the Tribe and failed to provide technical assistance.

Other districts that have applied *de novo* review to ISDEAA claims have concluded that ISDEAA's "text, its legislative history, and the general presumption favoring Indian tribes dictates a de novo review of [ISDEAA] claims." *Navajo Health Found.-Sage Mem'l Hosp., Inc. v. Burwell*, 100 F. Supp. 3d 1122, 1164 (D.N.M. 2015), *see also Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059, 1067 (D.S.D. 2007) ("[C]ourts looking at this issue have determined that Congress intended a *de novo* review for civil actions brought under the ISDEAA."). The text of the ISDEAA "grants district courts 'original jurisdiction' over 'civil actions' with authorization not only to enjoin or compel agency action, but to 'order appropriate relief including money damages.'" *Shoshone-Bannock Tribes of Fort Hall Reservation v. Shalala*, 988 F. Supp. 1306, 1314 (D. Or. 1997) (citing ISDEAA § 450m-1(a)). In combination, district courts have found these phrases sufficient to provide the right to *de novo* review. *See id.*; *see also Navajo Health Found.-Sage Mem'l Hosp.,* 100 F.Supp. 3d at 1163-64.

The legislative intent also supports *de novo* review. Given "Congressional concern with agency malfeasance, it would be ironic indeed if Congress offered the tribes nothing more than a record-based, deferential court review of agencies' actions." *Shoshone-Bannock Tribes of Fort Hall Reservation*, 988 F. Supp. at 1318. Finally, there is a general presumption that statutes affecting Indian rights should be liberally construed in favor of the Indians. *See id*. at 1317; *see also Maniilaq Ass'n v. Burwell*, 72 F. Supp. 3d 227, 232-33 (D.D.C. 2014) ("In enacting the ISDEAA, Congress explicitly codified the rule of construction in favor of Indian tribes."). Accordingly, the Court will apply *de novo* review to the present action.

### B. Statutory interpretation and *Chevron* deference in Indian Law

When interpreting a statute, courts must first determine whether Congress has specifically spoken to the question at issue, in other words, whether the statutory text is plain and

unambiguous.  *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009).  If it is, courts "must apply the statute according to its terms."  *Id*.  When deciding whether the statutory text is plain and unambiguous, a court "should not confine itself to examining a particular statutory provision in isolation" and should read the words in their context within the overall statutory scheme.  *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-133 (2000).  The Supreme Court has repeatedly stressed "in expounding a statute, [courts] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122 (1849); *see also Chemical Mfrs. Ass'n v. E.P.A.*, 217 F.3d 861, 867 (D.C. Cir. 2000) (quoting *Boisdore*).

      If the statutory text is ambiguous, there exist two canons of statutory interpretation relevant to this case.  Generally, when reviewing an agency's interpretation of its enabling statute and the laws it administers, courts are guided by "the principles of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007); *but see Scenic America, Inc. v. Dept. of Transportation, et al.*, Statement of Gorsuch, J., 583 U.S. __ 2017, No. 16-739, WL 4581902 (U.S. Oct. 16, 2017) (in the context of the Court's denial of certiorari, questioning whether *Chevron* deference should apply to an agency's interpretation of a disputed contractual term).  Under *Chevron*, if a statute is ambiguous or silent on an issue, an agency interpretation that is permissible and reasonable receives controlling weight, "even if the agency's reading differs from what the court believes is the best statutory interpretation." *National Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).  An interpretation is permissible and reasonable if it is not arbitrary, capricious, or manifestly contrary to the statute.  *Mount Royal Joint Venture*, 477 F.3d at 754.

In cases involving American Indians, however, courts have applied the canon of construction that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). This canon is "'rooted in the unique trust relationship between the United States and the Indians.'" *Id.* (quoting *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985)).

When an agency's interpretation of a statute conflicts with that of an American Indian tribe, Circuits are split on which canon controls.[4] In *Muscogee (Creek) Nation v. Hodel*, the D.C. Circuit chose to construe the legislation in favor of the tribe rather than adopt the agency's interpretation. 851 F.2d 1439, 1444-45 (D.C. Cir. 1988), *cert. denied*, 488 U.S. 1010 (1989). Relying on the canon that statutes "are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit," the Circuit held that, if legislation "can reasonably be construed as the Tribe would have it construed, it *must* be construed that way." *Id.* The Circuit has since reaffirmed that "[t]he governing canon of construction requires that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit,'" *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (quoting *Blackfeet Tribe of Indians*, 471 U.S. at 766), and that an agency's interpretation is given consideration but not deference. *See id.*; *see also Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 59 (D.C. Cir. 1991) (declining to defer to agency interpretation based on "the special strength

_____

[4] The Tenth Circuit has held "that the canon of construction favoring Native Americans controls over the more general rule of deference to agency interpretations of ambiguous statutes." *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1462 (10th Cir. 1997). The 9th Circuit chose to apply *Chevron* deference over the canon favoring native tribes, *Hayes v. United States*, 891 F.2d 235, 239 (9th Cir. 1989), although it more recently acknowledged the circuit split and declined to make an explicit finding on "the interplay between the *Chevron* and *Blackfeet Tribe* presumptions." *Navajo Nation v. Dep't of Health & Human Servs. Sec'y*, 325 F.3d 1133, 1136 n.4. (9th Cir. 2003).

of this canon"); *Maniilaq Ass'n*, 72 F. Supp. 3d at 232 ("[T]he canon of construction in favor of

Indian tribes can trump the deference to agencies' interpretations courts ordinarily give under

*Chevron* and its progeny. . . ."). Because the D.C. Circuit precedent is clear and binding on this

Court, phase one of the Tribe's suit will be analyzed under the canon favoring the Tribe so long

as its construction is reasonable.

## III. ANALYSIS

### A. Payor of Last Resort

At the core of the dispute between IHS and the Tribe over the implementation of

the Compact is the interpretation of the payor of last resort provision of the Indian Health Care

Improvement Act (IHCIA), 25 U.S.C. § 1623(b). The statutory payor of last resort provision

was added in 2010 by Affordable Care Act as an amendment to the IHCIA. *See* Patient

Protection and Affordable Care Act, § 2901(b), Pub. L. No. 111-148, 124 Stat. 333 (2010)

(codified at 25 U.S.C. § 1623(b)). In 1990, two decades before the Affordable Care Act, IHS

had adopted regulations with a payor of last resort rule:

> (a) The Indian Health Service is the payor of last resort for persons
> defined as eligible for contract health services under the regulations
> in this part, notwithstanding any State or local law or regulation to
> the contrary.
> . . .
> (c) Alternate resources means health care resources other than those
> of the Indian Health Service. Such resources include health care
> providers and institutions, and health care programs for the payment
> of health services including but not limited to programs under titles
> XVIII or XIX of the Social Security Act (i.e., Medicare, Medicaid),
> State or local health care programs, and private insurance.

42 C.F.R. § 136.61. IHS argues that this regulation was enacted to make CHS the payor of last

resort in relation to tribal self-insurance programs because "IHS did not provide for an exception

for tribal self-insurance in the rule itself." Defs.' Supp. Brief [Dkt. 55] at 7. However, to resolve

14

tension between CHS and tribal self-insurance programs following the adoption of the payor of

last resort regulation, IHS adopted a policy-based exception in 2008:

> The IHS is prohibited from seeking recovery when the health
> services provided to an eligible patient are covered by a self-
> insurance health plan funded by a Tribe or Tribal organization under
> Section 206(f) of the IHCIA, P.L. 94-437, 25 U.S.C. § 1621e(f).
> Consistent with congressional intent not to burden Tribal resources,
> the Agency has made a determination that tribally-funded self-
> insured health plans are not to be considered alternate resources for
> purposes of the IHS' Payor of Last Resort Rule.

Indian Health Manual § 2-3.8.I.[5]  IHS now argues that its policy-based exception was nullified

by Congress's addition of a payor of last resort provision to the IHCIA, which now provides:

> Health programs operated by the Indian Health Service, Indian
> tribes, tribal organizations, and Urban Indian organizations (as those
> terms are defined in section 1603 of this title) shall be the payer of
> last resort for services provided by such Service, tribes, or
> organizations to individuals eligible for services through such
> programs, notwithstanding any Federal, State, or local law to the
> contrary.

25 U.S.C. § 1623(b).  IHS insists that through this enactment, "Congress elevated IHS' payor of

last resort authority by giving it statutory effect" and thus "nullifie[d] IHS' policy-based

exception to the payor of last resort rule."  Defs.' Supp. Brief at 9.  IHS points to the definitions

of "Indian health program" and "Tribal health program" in the IHCIA to support its

interpretation.

> An "Indian health program" is:
>
> (A) any health program administered directly by the Service;
> (B) any tribal health program; and

---

[5] The parties cite the Indian Health Manual included in the administrative record, [Dkt. 45-4] at
IHS000149, which appears to be a pre-2008 version of the Manual that does not include this
provision.  The updated Manual, with § 2-3.8I, can be found on IHS' website:
https://www.ihs.gov/ihm/index.cfm?module=dsp_ihm_pc_p2c3#2-3.8I (last accessed Oct. 24,
2017).

> (C) any Indian tribe or tribal organization to which the Secretary provides funding pursuant to section 47 of this title.[6]

25 U.S.C. § 1603(12). A "tribal health program" means:

> [A]n Indian tribe or tribal organization that operates any health program, service, function, activity, or facility funded, in whole or part, by the Service through, or provided for in, a contract or compact with the Service under the Indian Self-Determination and Education Assistance Act.

*Id.* § 1603(25). According to IHS, these definitions of an Indian or tribal health program require that IHS either administer a health program for Indians directly or provide funding for it through an ISDEAA Compact. IHS contends that the definitions inevitably rob a tribe's self-insurance program of similar status, as self insurance is neither funded nor administered by IHS. Thus, the agency insists, a tribal self-insurance program cannot be a payor of last resort under § 1623(b).

A plain reading of the statute does not support this limiting—and unduly expensive—interpretation. The Court is grateful to the *Amici* for their elucidating brief, much of whose reasoning the Court adopts.[7] Section 1623(b) states that "Health programs operated by the Indian Health Service, *Indian tribes*, *tribal organizations*, and *Urban Indian organizations* . . . shall be the payor of last resort." 25 U.S.C. § 1623(b). Nowhere does § 1623(b) reference "Indian health program" or "tribal health program," both of which have very particular meanings. The relevant definitions are for "Indian tribe," "tribal organization," and "Urban Indian organization." An "Indian tribe" is:

---

[6] Section 47 governs the "employment of Indian labor and purchase of products of Indian industry" as well as "participation in [the] Mentor-Protégé Program." 25 U.S.C. § 47.

[7] The *Amici* are the Alaska Native Health Board, Jamestown S'Klallam Tribe, Mohegan Tribe of Connecticut, Northwest Portland Area Indian Health Board, Inc., Seminole Tribe of Florida, Suquamish Tribe, and United South and Eastern Tribes, Inc. They are "federally recognized Indian tribes and inter-tribal organizations that operate a variety of health care programs under the [ISDEAA, IHCIA], and their inherent tribal government authority." Amicus Brief [Dkt. 38] at 1.

> [A]ny Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or group or regional or village corporation . . . which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

25 U.S.C. § 1603(14). The term "tribal organization" means:

> [T]he recognized governing body of any Indian tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities: *Provided,* That in any case where a contract is let or grant made to an organization to perform services benefiting more than one Indian tribe, the approval of each such Indian tribe shall be a prerequisite to the letting or making of such contract or grant.

25 U.S.C. § 5304(l). The term "urban Indian organization" is defined as:

> [A] nonprofit corporate body situated in an urban center, governed by an urban Indian controlled board of directors, and providing for the maximum participation of all interested Indian groups and individuals, which body is capable of legally cooperating with other public and private entities for the purpose of performing the activities described in section 1653(a)[8] of this title.

25 U.S.C. § 1603(29).

Section 1623(b) refers to "health programs operated by" Indian tribes, tribal organizations, or urban Indian organizations. This is distinct from an "Indian health program" which, by its own definition, could be administered directly by IHS, with no involvement from a tribe, tribal organization, or urban Indian organization. 25 U.S.C. § 1603(12)(A). It is also distinct from a "tribal health program" which is a term used for programs provided for in an ISDEAA compact. 25 U.S.C. §1603(25) (describing a program "funded, in whole or in part, by the Service through, or provided for in, a contract or compact with the Service under the Indian

---

[8] Section 1653(a) governs the kinds of contracts and/or grants that can be entered into between IHS and urban Indian organizations.

Self-Determination and Education Assistance Act").  A plain reading of the definitions of these terms makes clear that both "Indian health program" and "tribal health program" have specific meanings that are not equivalent to, and are more narrow than, "a health program operated by" an Indian tribe, tribal organization, or urban Indian organization.  IHS' attempt to equate the broader terms in § 1623(b) with the limited and specific terminology of its existing regulation ignores that language actually adopted by Congress in 2010.  Had Congress intended to refer to "Indian health programs" or "tribal health programs" it would have used those terms, as clearly defined and used repeatedly throughout the IHCIA.[9]  That it did not is both instructive and meaningful.

An examination of the IHCIA as a whole supports the Court's plain reading of § 1623(b).  The IHCIA's declaration of national Indian health policy states:

> Congress declares that it is the policy of this Nation, in fulfillment of its special trust responsibilities and legal obligations to Indians—
> . . .
> to provide funding for programs and facilities operated by Indian tribes and tribal organizations in amounts that are not less than the amounts provided to programs and facilities operated directly by the Service.

25 U.S.C. § 1602(7).  This provision is notable for two reasons.  First, it uses language similar to that in § 1623(b)—"programs and facilities operated by Indian tribes and tribal organizations"— and distinguishes such programs from those "operated directly by the Service," meaning that the former are programs not operated by the Service.  To substitute "Indian health programs" for

---

[9] In addition to definitions, the exact phrase "tribal health program" is used in fourteen IHCIA provisions, and "Indian health program" in nineteen provisions.  *See* 25 U.S.C. §§ 1616n, 1616q, 1621, 1621c(c), 1621d(c), 1621j(c), 1621l(b), 1621t, 1638a, 1641d, 1665h(h), 1667a(4), 1680l(b), 1680r (using the term "tribal health program"); 25 U.S.C. §§ 1615, 1616a, 1616c, 1616d, 1616e, 1616g, 1616k, 1616m, 1616p, 1621l, 1621p, 1638e, 1641, 1665m, 1667, 1675, 1680b, 1680q, 1680t (using the term "Indian health program").

"programs and facilities operated by Indian tribes" would contradict the statute and lead to an absurd result because, as discussed above, an Indian health program can, by definition, be "administered directly by the Service." *Id.* § 1603(12). "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

Given the unambiguous plain meaning of § 1623(b), the question becomes whether the Tribe's self-insurance plan qualifies. None of the parties disputes that Redding Rancheria is an "Indian tribe . . . which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 1603(14); *see also Rancheria v. Jewell*, 776 F.3d 706, 709 (9th Cir. 2015) (finding that the Redding Rancheria was first recognized by the United States in 1922, stripped of its federal recognition in 1965, and restored as federally-recognized in 1984).

The IHCIA does not define "health program" but the IHS payor of last resort regulation provides a non-exhaustive list of "alternative resources," which are health programs that may not be considered payors of last resort: "health care providers and institutions, and health care programs for the payment of health services including but not limited to programs under titles XVIII or XIX of the Social Security Act (i.e., Medicare, Medicaid), State or local health care programs, and private insurance." 42 C.F.R. § 136.61(c). "Health programs" may therefore include a variety of insurance programs. The inclusion of "private insurance" suggests that health insurance need not be funded by federal, state, or local government funds. A tribal self-insurance program is a "health program" as so understood and thus may be considered a "[h]ealth program operated by . . . [an] Indian tribe," or "payor of last resort" as defined in the

IHCIA.  25 U.S.C. § 1623(b).  To the extent that any discrepancy is perceived between the 1990

regulation and the 2010 adoption of § 1623(b), the broader language of the statute controls.  *See,*

*e.g.*, *Cobell*, 240 F.3d at 1101 (affirming that statutes should be construed liberally in favor of

American Indians, and that in such cases agency interpretations warrant consideration but not

deference).

### B.  The Tribe's Exclusionary Clause

In its supplemental brief, IHS states that it continues to recognize its policy-based

exception to its payor of last resort regulation for tribal self-insurance programs pending the

promulgation of a new regulation under § 1623(b).  Defs.' Supp. Brief at 9-10.  Nevertheless, it

insists that the Tribe's coordination of benefits does "not fit within the tribal self-insurance

exception that has been recognized by IHS," *id*. at 10, because the "conditional nature of the

Tribe's exclusionary clause [does] not comply with IHS policy."  Defs.' Supp. Brief, Ex. 1,

Declaration of Terry Schmidt (Schmidt Decl.) [Dkt. 55-1] ¶ 25.  "'IHS would allow CHEF

payments . . . if the Tribe employed a broad exclusionary clause with no coordination between its

self-insurance and CHS programs.'"  *Id*. (quoting with approval the Tribe's assessment of IHS'

position).  Thus, the agency takes the position that the Tribe's exclusionary clause makes the

Tribal Self-Insurance Plan *always* the payor of last resort.  Only absent an exclusionary clause

would CHS *always* be the payor of last resort.  According to IHS, the hybrid model adopted by

the Tribe, in which the entity able to get the lowest rate is the payor of last resort, is inconsistent

with its policy-based exception.

IHS takes an untenable position for two reasons.  First, as already explained

above, Congress included health programs *operated by* Indian tribes in the definition of a payor

of last resort.  Under the statute, the Tribe's self-insurance program may be the payor of last resort, as may be the Tribe's CHS program.

Second, in cases where it is unclear whether the payor of last resort is the Tribe's self-funded insurance or CHS, funded by IHS, the IHCIA provides that the Tribe can decide which program is primary:

> Absent specific written authorization by the governing body of an Indian tribe . . . the United States shall not have a right of recovery under this section if the injury, illness, or disability for which health services were provided is covered under a self-insurance plan funded by an Indian tribe, tribal organization, or urban Indian organization. Where such authorization is provided, the Service may receive and expend such amounts for the provision of additional health services consistent with such authorization.

25 U.S.C. § 1621e(f).  When Congress first adopted § 1621e(f), in 1992, it had stated only that the "United States shall not have a right of recovery under this section if the injury, illness, or disability for which health services were provided is covered under a self-insurance plan funded by an Indian tribe or tribal organization."  Indian Health Amendments of 1992, Pub. L. No. 102–573, § 209(b)(2), 106 Stat. 4526 (1992).  In 2010, Congress explicitly provided that a tribe may opt to allow the United States to recover for services paid by CHS but also covered under a self-insurance program by giving "specific written authorization."  Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10221(a), 124 Stat. 119 (2010); *see also* S. 1790, 111th Cong. § 206 (as passed by the Affordable Care Act).

A reading of the payor of last resort provision to exclude tribal self-insurance programs, as urged by IHS, would directly contradict this clear intention to prevent the federal government from recovery for services covered by a self-insurance plan absent specific written authorization from the tribe.  That the language of § 1621e(f) was introduced in the same act as § 1623(b)—the payor of last resort provision—underscores the incongruity of IHS' position.  *See*

*Brown & Williamson Tobacco*, 529 U.S. at 133 ("A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into a harmonious whole." [citations and internal quotation marks omitted]).  Indeed, prior to 2010, even IHS relied on § 1621e(f) to adopt its policy-based exception, stating:  "Consistent with congressional intent not to burden Tribal resources, the Agency has made a determination that tribally-funded self-insured health plans are not to be considered alternate resources for purposes of the IHS' Payor of Last Resort Rule."  Indian Health Manual § 2-3.8.I.

As a result of its erroneous interpretation of IHCIA's payor of last resort provision, IHS has refused to reimburse the Tribe from CHEF funds, insisting that the Tribe's coordination of benefits scheme runs contrary to the payor of last resort provision and its own policy-based exception.  In reality, the Tribe's coordination of benefits does precisely what Congress has envisioned:  the Tribe may, if it gives written authorization, agree that CHS can recover for services the government paid for if the services were also covered by its Tribal Self-Insurance Plan.  In this case, the Tribe has given written authorization, through its exclusionary clause, for the United States to recover *unless* the CHS charge is lower than the charge made by the Tribal Self-Insurance Plan or if the service is eligible for CHEF funding.  IHS does not dispute that by refusing to accept the Tribe's coordination of benefits it "creates inefficiencies . . . because Redding Rancheria has negotiated lower rates for its Supplemental Program than for its CHS program services;" nonetheless, IHS insists on its position to effect "consistent application of its CHS and CHEF policies."  Defs.' Supp. Brief at 12, 13.  Because principles of statutory interpretation favor the Tribe's interpretation, and because the statutory text and purpose allow the Tribe's Coordination of Benefits, the Court concludes that IHS' preference for consistency does not withstand scrutiny.

## C. The IHS Payor of Last Resort Regulation

IHS relies heavily on its interpretation of its own 1990 regulation, which it argues was enacted to make CHS the payor of last resort because "IHS did not provide for an exception for tribal self-insurance in the rule itself." Defs.' Supp. Brief at 7. Generally, an agency's interpretation of its own regulation is given controlling weight unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Udall v. Tallman*, 380 U.S. 1, 16 (1965)).

In this case the IHS interpretation of its own regulation is most curious and unsupported. Back in 1990, IHS stated that it adopted the regulation to "clarify the direct conflict between the Federal regulation and State or local residuality rules." IHS; Contract Health Services, 55 Fed. Reg. 4606-01, 4607 (Feb. 9, 1990) (codified at 42 C.F.R. § 136.61). The 1990 regulation was "designed to accommodate the Indians [sic] rights as State citizens with the need to conserve very limited IHS contract care funds for the benefit of the entire tribal service population." *Id.* It was intended to emphasize the congressional intention that "State programs may not avoid responsibility for health care to Indians by insisting that such programs are residual to IHS," *id.*, and to make clear that "'the inability to tax the Native Americans does not logically support an inference that a State or county lacks authority to provide equal benefits to all residents.'" *Id.* at 4607-08 (quoting *State of Arizona v. United States*, No. 87-2525, 1988 WL 96613, at *7 (9th Cir. Sept. 12, 1988)).

Thus, the language "notwithstanding any State or local law or regulation to the contrary," 42 C.F.R. § 136.61(a), was included to *increase* health services available to tribes by ensuring Indians were able to access state and local resources to which they were entitled as state

citizens, *in addition to* federal health programs for Indians. The 1990 regulation made no

mention of tribal self-insurance plans; the agency's current attempt to rely on it to support the

argument that "IHS did not provide for an exception for tribal self-insurance," Defs.' Supp. Brief

at 7, gives the regulation a purpose well beyond that expressly stated by IHS when it was

announced and adopted.

### D. Are CHEF Benefits Subject to a Contract Remedy?

IHS argues that the Tribe improperly seeks a contract remedy under ISDEAA that

is expressly precluded by IHCIA, which governs the use and administration of CHEF:

> No part of CHEF or its administration *shall be subject to contract*
> or grant under any law, including the Indian Self-Determination and
> Education Assistance Act . . . , nor shall CHEF funds be allocated,
> apportioned, or delegated on an Area Office, Service Unit, or other
> similar basis.

25 U.S.C. § 1621a(c) (emphasis added). IHS acknowledges that the "Compact currently

includes general language recognizing that IHS would make CHEF available in accordance with

existing IHS policies and procedures."[10] Defs.' Mot. for Summ. J. at 24, n.12. However, the

"Compact does not contain any language requiring IHS to approve the Tribe's CHEF

reimbursement requests" and "[n]othing in the Compact makes any part of the CHEF or the

agency's administration of CHEF subject to . . . the Compact." *Id.*

Contrary to this argument, the Tribe does not sue for CHEF benefits under its

self-determination Compact. It sues for what the Compact provides: *access to* CHEF benefits

and proper consideration of its applications for such benefits. In no way does the current suit

seek to effect the contracting of a "part of CHEF or its administration." 25 U.S.C. § 1621a(c).

---

[10] The Compact provides: "If the expenses to the Tribe for a medical problem exceed the threshold amount established by the IHS, CHEF allowances will be made available to the Tribe to fund all expenses above the threshold for the problem in accordance with CHEF policy and procedure." Funding Agreement § 6.

The Tribe seeks only to require IHS to conduct itself in a manner that is consistent with the laws by which Congress has imposed certain obligations on the agency when reviewing Tribal CHEF applications. The IHS argument that the Tribe's lawsuit is precluded by § 1621a(c) is based on a faulty premise and is without merit.

### E.  Remand to IHS

Remand is appropriate "[i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged action on the basis of the record before it." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  In light of the plain meaning of the payor of last resort provision in IHCIA, the case will be remanded to IHS for re-consideration of the Tribe's six CHEF applications.  As the record now stands, there is insufficient information for the Court to make a final decision on the Tribe's CHEF applications on *de novo* review.  IHS admits that it "did not continue to analyze Redding Rancheria's requests for reimbursement from the CHEF once it determined that Redding Rancheria's exclusionary clause remained unchanged." Defs.' Supp. Brief at 13.  As this opinion makes clear, the Tribe's reimbursement requests were valid CHS obligations that warrant consideration by IHS.  On remand, IHS must review and analyze the Tribe's claims in a manner consistent with this Court's opinion.  The Court will retain jurisdiction pending a decision from IHS on the Tribe's six CHEF applications.

The Tribe specifically challenges several other agency decisions in this case:  (1) denials of two requests for an administrative waiver; (2) denials of repeated requests for consultation; (3) denial of the Tribe's Final Offer to amend the Compact; and (4) denial of the Tribe's Contract Disputes Act claim.  Each of these decisions stems from IHS' denial of the Tribe's CHEF applications, which the Tribe sought to remedy through these additional attempts

at administrative relief.  Given the Court's remand for a new decision on the Tribe's CHEF applications, it will not address the merits of these other agency actions or inactions.

## CONCLUSION

For the reasons given above, the Tribe's Motion for Summary Judgment [Dkt. 34] will be granted in part, with respect to the denial of the Tribe's six CHEF applications, and denied in part, with respect to the Tribe's request that the Court grant immediate injunctive and declaratory relief.  Defendants' Motion for Summary Judgment [Dkt. 31] will be denied.  The case will be remanded to IHS for reconsideration and a decision on the Tribe's six CHEF applications consistent with this opinion.  The Court will retain jurisdiction pending a decision from IHS.  A memorializing order accompanies this Opinion.


Date: November 7, 2017

                                        _____/s/_____
                                        ROSEMARY M. COLLYER
                                        United States District Judge